797 F.2d 1062
 254 U.S.App.D.C. 395
 POPULATION INSTITUTE, Population Council, et al., Appellants,
v.
M. Peter McPHERSON, Administrator, et al.
POPULATION INSTITUTE, Appellant, William S. Green, et al.
v.
M. Peter McPHERSON, Administrator, et al.
 Nos. 85-6042, 85-6043.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 16, 1986.
Decided Aug. 12, 1986.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 85-03131).
 Stanley J. Marcuss, with whom Dorothy A. Doherty and George V. Allen, Jr., Washington, D.C. were on brief, for appellant in Nos. 85-6042 and 85-6043.
 Robert V. Zener, Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty. and Leonard Schaitman, Dept. of Justice, Washington, D.C. were on brief, for appellees in Nos. 85-6042 and 85-6043.
 Before MIKVA and BORK, Circuit Judges, and GREENE,* District Judge.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 The Administrator of the Agency for International Development (AID) has withheld ten million dollars earmarked by Congress for the United Nations Fund for Population Activities (UNFPA). The Administrator determined that a statutory prohibition on funding "any organization ... which ... supports or participates in the management of a program of coercive abortion or involuntary sterilization" bars the UNFPA from receiving the earmarked funds. Appellant, Population Institute, has been a grantee of UNFPA; it filed suit in the United States District Court to enjoin the Administrator from withholding such funds.
 
 
 2
 The district court ultimately dismissed appellant's complaint. Because we find that the Administrator's determination to withhold earmarked funds was reasonable, the Administrator may disburse the withheld funds in accord with his decision to reprogram them. We disagree, however, with the district court's reasons for dismissal and accordingly vacate that decision and remand the case with instructions.
 
 I.
 
 3
 The Agency for International Development is part of the United States government and is charged with providing assistance for family planning and demographic projects abroad. See 22 U.S.C. Sec. 2151b; Reorganization Plan No. 2 of 1979, 44 Fed.Reg. 41,165 (1979); Executive Order 12163, 44 Fed.Reg. 56,673 (1979). In October 1984, Congress appropriated $290 million to the AID for population planning programs. Foreign Assistance and Related Programs Appropriations Act of 1985, Pub.L. No. 98-473, 98 Stat. 1837, 1887 (1984) ("the Act"). The Act provided "[t]hat not less than $46 million, or 16 per centum of the amount appropriated, ... whichever is lower shall be available to support the United Nations Fund for Population Activities." Id. The UNFPA uses the funds it receives from the AID to provide grants to foreign countries and private agencies engaged in population control activities. Appellants Population Council and Population Institute, both private entities, receive grants from the UNFPA and devote them to population planning and demographic programs in the People's Republic of China.
 
 
 4
 Congress restricted the availability of earmarked funds for population planning programs. The Act provided "[t]hat none of the funds appropriated under this paragraph may be available to any country [or organization] which includes as part of its population planning programs involuntary abortion." In July of 1985, a Supplemental Appropriations Act for fiscal year 1985, Pub.L. No. 99-88, 99 Stat. 293 (1985), amended the Act and imposed a new condition on the disbursement of funds appropriated for population planning. That amendment ("the amendment") provides that
 
 
 5
 [n]one of the funds made available in this bill nor any unobligated balances from prior appropriations may be made available to any organization or program which, as determined by the President of the United States, supports or participates in the management of a program of coercive abortion or involuntary sterilization.
 
 
 6
 The new restrictions on population planning funds resulted from heated controversy in the Congress and the Executive. The People's Republic of China has a one-child-per-family policy. Some U.S. policymakers suspect that coerced abortions and involuntary sterilization play a part in enforcing this population control goal. Because of these suspicions, some members of the Administration and the Congress desire to end all funding for Chinese population control programs. Others doubt the reports of atrocities and coercive practices in China, and believe that China's programs should be supported by the United States.
 
 
 7
 On March 30, 1985, the Administrator of AID announced his determination to withhold $10 million from the UNFPA. AID News Release No. 0021 (Mar. 30, 1985). The Administrator did not, however, find that UNFPA violated the Act's proscription on funding an "organization which includes as part of its population planning programs involuntary abortion." See id.; 131 Cong.Rec. S8526 (daily ed. June 20, 1985) (remarks of Senator Inouye). Indeed, the Administrator explained that "UNFPA neither funds abortions nor supports coercive family planning practices through its programs. However, ... the practices in the family planning programs of [China] is [sic ] such that any support for that country's programs is linked with and gives the appearance of condoning its practices." AID News Release No. 0021 at 1. The Administrator could not withhold the earmarked funds in question indefinitely without finding that the UNFPA had violated the statutory restriction. He therefore announced that he would seek to have Congress remove the earmark and grant him authority to reprogram the $10 million.
 
 
 8
 Accordingly, on May 17, 1985, the President wrote to the Speaker of the House and requested that the Congress reduce fiscal 1985 funds earmarked for UNFPA from $46 to $36 million. Congress rejected the request and retained the $46 million earmarked for UNFPA funding. However, in a supplemental appropriations bill, H.R. 2577, the House proposed to amend the statutory limitations on the obligation of population planning funds by adding the following language:
 
 
 9
 None of the funds made available in this bill nor any unobligated balances from prior appropriations may be made available to any organization or program which supports or participates in the management of a program of coercive abortion.
 
 
 10
 See 131 Cong.Rec. H4052 (daily ed. June 11, 1985). On June 12 the House passed H.R. 2577 with the above language. See 131 Cong.Rec. H4200-01 (daily ed. June 12, 1985). In additional views appended to the House Committee Report, Representative Kemp, sponsor of the new limitation, stated that "the United Nations Fund for Population Activities would be immediately affected by this amendment because of its involvement with the program of coercive abortion in the People's Republic of China." H.R.Rep. No. 99-142, 99th Cong. 1st Sess. at 232.
 
 
 11
 After passing the House, H.R. 2577 was introduced in the Senate and referred to the Appropriations Committee. 131 Cong.Rec. S8170 (daily ed. June 13, 1985). The Senate Committee added the "as determined by the President of the United States" clause to the House version of the amendment. This addition was proposed by Senator Daniel Inouye, an opponent of defunding UNFPA activities in China. In its report, the Senate Committee stated that it believed the House version of the amendment would have "the effect of prohibiting any further U.S. assistance in fiscal year 1985 to the ... UNFPA." S.Rep. No. 99-82, 99th Cong., 1st Sess. at 107. The Inouye amendment was apparently designed to avoid this result. The Committee explained the addition of the Inouye amendment as follows:
 
 
 12
 The Committee finds that this issue is of such significance that the determination ought to be made by the President of the United States. The Committee recognizes that the President is empowered to delegate such responsibilities and would, in this particular instance, expect that the responsibility for making the required determination would, if delegated, be delegated only to the Secretary of State.
 
 
 13
 S.Rep. No. 99-82, 99th Cong., 1st Sess. at 107-08. The Senate Committee did not, however, include any specific language that affected the President's authority to delegate responsibility for making the determination. On June 20th the Senate passed the bill with both the Inouye amendment and a further amendment proposed by Senator Helms that added the words "or involuntary sterilization" to the provision. See 131 Cong.Rec. S8524-25 (daily ed. June 20, 1985); 131 Cong.Rec. S8587 (daily ed. June 20, 1985).
 
 
 14
 The Conference Committee accepted the Senate's amendments to H.R. 2577. See H.R.Rep. No. 99-236, 99th Cong., 1st Sess. at 53-54. The Committee reiterated the Senate Appropriations Committee's desire that the determination called for by the amendment be made by the President or the Secretary of State. The Conference Committee did not comment on the effect it believed the amendment would have on UNFPA funding. On August 15, 1985, the bill became law. Pub.L. 99-88, 99 Stat. 293.
 
 
 15
 On September 19th, the President delegated his authority to make the determination called for in the amendment to the Secretary of State. The President gave the Secretary full authority to redelegate the delegated authority. See Memorandum for the Secretary of State (Sept. 19, 1985); 3 U.S.C. Sec. 301 (authorizing the President to make such delegations); 22 U.S.C. Sec. 2381(a) ("The President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct."). Pursuant to the President's express authorization of a redelegation, the Secretary of State delegated the authority to M. Peter McPherson, Administrator of the AID and Acting Director of the International Development Cooperation Agency (IDCA), the AID's parent agency. See Memorandum for the Secretary of State, supra; 22 U.S.C. Sec. 2381(a); Executive Order 12163, 44 Fed.Reg. 56,673 (1985).
 
 
 16
 On September 25, 1985, McPherson determined that $10 million of the $46 million earmarked for the UNFPA would not be "obligated for that purpose because ... the UNFPA is participating in the management of a program of coercive abortion and involuntary sterilization in the People's Republic of China." Letter from M. Peter McPherson to the Honorable Mark O. Hatfield, Chairman of the Senate Committee on Appropriations at 1 (Sept. 25, 1985). By September 30th, the last day of fiscal year 1985, AID had reprogrammed the $10 million dollars withheld from the UNFPA.
 
 
 17
 On September 30, 1985, plaintiffs filed suit in the District Court for the District of Columbia to enjoin McPherson from withholding the $10 million from the UNFPA. The complaint alleged that the Administrator acted under an unlawful delegation of authority; that, because it resulted from a misinterpretation of the amendment, the Administrator's action was clearly erroneous; and that the Administrator's action was arbitrary and capricious because there was no evidence that UNFPA was involved in any program of coercive abortion or involuntary sterilization. On the same day the complaint was filed the district court entered a temporary restraining order that enjoined the government from disbursing the $10 million. Plaintiffs subsequently sought a preliminary injunction and the defendants moved to dismiss.
 
 
 18
 On October 18, 1985, the district court granted the defendants' motion to dismiss. Population Institute v. McPherson, No. 85-3131, slip op. (D.D.C. Oct. 18, 1985). That same day plaintiffs filed a notice of appeal. On October 25th appellants moved this court for an injunction pending appeal prohibiting defendants from disbursing the funds in question to other recipients. We issued an opinion then that detailed the district court's opinion. Because that opinion was not published, it is reprinted as an appendix to this opinion. In brief, the district court concluded that the Population Institute had standing, that the controversy was not moot, that the President's delegation of authority to the Administrator was proper, but that the plaintiffs' challenges to the Administrator's action presented nonjusticiable political questions. See Population Institute v. McPherson, No. 85-6042, Order at 6-9 (D.C.Cir. Nov. 13, 1985), reprinted infra, p. 1074.
 
 
 19
 On November 13, 1985, this court granted the Population Council's motion for an injunction pending appeal. See infra, p. 1074. We concluded that appellants had shown a high likelihood of succeeding in their appeal, that they would be irreparably harmed by being deprived of the $10 million, that no third parties would suffer undue harm if we granted the injunction, and that the public has an interest in assuring that the funds were allocated as Congress intended. See infra at 1078-82. Thus, injunctive relief was appropriate. See Cuomo v. United States Nuclear Regulatory Commission, 772 F.2d 972, 974 (D.C.Cir.1985); Wisconsin Gas Co. v. Federal Energy Regulatory Commission, 758 F.2d 669, 673-74 (D.C.Cir.1985) (per curiam).
 
 
 20
 In granting appellants' motion for an injunction we considered their arguments on the propriety of Administrator McPherson having made the determination at issue and on the reviewability and correctness of that determination as a matter of law. With respect to the delegation argument, we concluded that "it appears the district court decision was correct, [and that] appellant has failed to establish a likelihood of success on the ... issue." See infra, at 1079. We thought, however, that the plaintiffs' chance of success in challenging the substance of the Administrator's determination were much better. We did not believe that the Administrator's determination would present a nonjusticiable political question. Instead, the correctness of the Administrator's interpretation of the amendment appeared to be a simple question of statutory construction that a court was competent to examine. And our examination of the substantive reasonableness of his determination convinced us that there was a good probability the determination would not be upheld on appeal. See infra, at 1079-81.
 
 
 21
 We found that "McPherson's decision to bar further funding of UNFPA was ... premised on his conviction that the statute, as interpreted by Representative Kemp, left him no alternative" but to withhold the funds. infra at 1080 (emphasis in original).
 
 
 22
 Administrator McPherson seems to have misunderstood his role in interpreting the amendment. His role was clearly and emphatically to arrive at an interpretation which, in his opinion, best represented the whole Congress' understanding of the amendment. Yet, instead of trying to put the puzzle together by looking at all of the relevant factors, such as the language, committee reports, floor debate, and individual statements of the various senators and congressmen, the Administrator appears to have considered himself absolutely bound by the statements of Representative Kemp, the author of the amendment in the House.
 
 
 23
 Infra, at 1080. In sum, we held that the Administrator cannot delegate his responsibility to interpret the will of Congress to a single member of Congress. Thus, because of the significant likelihood that plaintiffs would prevail on this issue on appeal, we granted an injunction pending appeal.
 
 
 24
 In granting the injunction, we emphasized that
 
 
 25
 [i]t is not for the court to determine, even if Administrator McPherson had properly evaluated all of the evidence bearing on Congress' intent, he would have reached the same conclusion. The opportunity to reach a reasoned interpretation of the statute belongs to the President and his delegates. We hold only that there is a reasonable likelihood that appellant will succeed in demonstrating that the President's delegate comitted legal error when he mistakenly assumed that he was compelled by law to apply the statutoryinterpretation advanced by the author of the statutory language.... The issue of whether coerced abortions occur in China is not before this court, and, indeed, may well present a nonjusticiable question.... [W]e have neither considered nor decided whether UNFPA participates in coercive practices in China. We have merely indicated that appellant is likely to succeed in a remand to the agency for reconsideration of the decision that UNFPA's participation comes within the statutory ban.
 
 
 26
 Infra, at 1080-81.
 
 
 27
 Before we could hear the case on the merits, the Administrator issued a statement affirming his earlier decision to withhold funds from UNFPA but examining the statute with greater detail and in light of our decision granting the injunction. See Statement of M. Peter McPherson (Nov. 25, 1985). Because we believed that "[t]he Administrator's November 25, 1985 statement has addressed the concerns expressed in this court's memorandum and order of November 13, 1985 granting the injunction pending appeal," [see infra, p. 1074], we vacated our injunction. See Population Council v. McPherson, No. 85-6042, Order (D.C.Cir. Dec. 5, 1985). The matter has not been mooted by disbursement of the funds in question, however, and the case is now before us for decision on the merits.
 
 II.
 A.
 
 28
 The appellants do not raise their improper-delegation argument on appeal and we do not address it. Accordingly, we leave undisturbed the decision of the district court that McPherson was authorized to make the determination called for by the amendment.
 
 B.
 
 29
 The Administrator claims that this case presents a nonjusticiable political question. He contends that by reviewing his determination under the amendment, this court would impermissibly interfere with foreign affairs. The Administrator asserts that
 
 
 30
 [e]veryone would agree that some kinds of "assistance" constitute "participation," while others do not; and one may posit a wide spectrum of factual situations, some clearly qualifying as "participation," some not, and some within the range of reasonable disagreement.... In the event the Court were to disagree with the Administrator's interpretation, the necessary result would be a remand requiring the Administrator to describe and discuss in greater detail those aspects of the factual situation which have special importance under the Court's reading of the statute. In taking this action, the Court would inevitably intrude in important foreign policy concerns.
 
 
 31
 Brief for the Appellees at 12.
 
 
 32
 The district court also believed that the Administrator's determination was a nonjusticiable political question. We disagree, as we did in our decision on the injunction pending appeal. The district court's conclusion followed from its belief that review of the Administrator's determination involved "resolution of the issue of the nature of China's population policy...." Population Institute v. McPherson, No. 85-3131, slip op. at 18 (D.D.C. Oct. 18, 1985).
 
 
 33
 Both the district court and the Administrator take too narrow a view of the nature of the required determination. The correctness of the Administrator's determination involves more than a review of his conclusions about the nature of China's programs. In deciding to end UNFPA funding for activities in China, the Administrator assessed not only the situation in China, but also measured that situation against the amendment's strictures. That is, an essential part of the Administrator's determination under the amendment is an explanation of what exactly he believes the amendment requires him to determine. The question that is then presented for our review is whether the Administrator has arrived at the determination that he is required to make by statute with due regard for the intent of Congress in enacting that statute. Simply because the result of that determination will have an effect on international relations does not completely strip the courts of the power and duty to review the legislative interpretation that supports the decision. The judiciary is well situated to decide if the Administrator has relied upon a supportable interpretation of the amendment.
 
 
 34
 In reaching and deciding the question of whether the Administrator's interpretation of the amendment is reasonable, we need not consider the situation in China. The district court was probably correct to assert that "[t]he Executive's characterization of China's population program is thus entitled to great deference. In fact, a judicial determination of the nature of China's population planning programs would involve 'the potentiality of embarrassment from multifarious pronouncements by various departments on one question.' Baker v. Carr, 369 U.S. 186, 217 [82 S.Ct. 691, 710, 7 L.Ed.2d 663] (1962)." This, however, is not the issue before us.
 
 
 35
 The Supreme Court has made clear that a court "must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If, however, Congress' purpose can not be so clearly divined and "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782. If the agency charged with administering a statute has reasonably interpreted the statute, its interpretation must be upheld. In reviewing the Administrator's determination here we intend to do no more than assure that he has adopted a reasonable reading of the amendment.
 
 
 36
 When the Administrator first determined that the UNFPA could not continue to receive funds for use in China, he stated that
 
 
 37
 [s]ince the UNFPA provides assistance to the People's Republic of China in the general management areas described in Congressman Kemp's Additional Views to the Report accompanying the FY 1985 Supplemental Appropriations Act, and since we have concluded that sufficient evidence exists to indicate that implementation of the population program of the Government of the People's Republic of China results in such abuses, we have no alternative but to bar further obligation of funds in Fiscal Year 1985 to the UNFPA.
 
 
 38
 Letter from M. Peter McPherson to the Hon. Mark Hatfield, Chairman, Senate Committee on Appropriations (Sept. 25, 1985).
 
 
 39
 As we discussed in our order granting an injunction pending appeal, we have little difficulty in recognizing that this explanation grows out of a fundamentally flawed approach to the interpretation of statutes. In discussing the role of legislative history, we noted that the Administrator had relied far too heavily on Representative Kemp's views. We stated that
 
 
 40
 The purpose and function of looking at the legislative history of a statute is to find out what Congress meant by its enactment. An individual legislator's expression of his understanding of a statute is only relevant inasmuch as it provides yet another piece in the puzzle of discerning legislative intent. The main pieces are, of course, the actual words that Congress chose to express its intention.... [T]he key to legislative history is that while many elements represent pieces in the puzzle, no one piece--no matter how clear and unequivocal--is alone dispositive.
 
 
 41
 Population Institute v. McPherson, infra, at 1080 (Nov. 13, 1985). We continue to believe that we have the authority and the duty to ensure that Administrator McPherson has not relied on such an untenable view of statutory analysis in arriving at his decision. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 
 42
 We emphasize that our review of the Administrator's determination will of course be guided by the principles of deference articulated in Chevron. Moreover, we are not unmindful of the special deference that should be accorded the executive in those activities that impinge on foreign affairs. See, e.g., United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed.2d 255 (1936). These principles of deference do not alter our conclusion, however, that this case does not present a nonjusticiable political question and that we may review the Administrator's determination.
 
 
 43
 Even the limited review of the Administrator's determination that we undertake here will likely have some effect on the Executive's latitude in conducting foreign affairs. Although no substantial claim has been advanced that this vague impact transforms the case into a political question, we pause to explain why it does not. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), perhaps the leading case on the contours of the political question doctrine, makes clear that more than an impact on foreign relations is required before a political case becomes a political question. The Court said:
 
 
 44
 There are sweeping statements to the effect that all questions touching foreign relations are political questions. Not only does resolution of such issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand single-voiced statement of the Government's views. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptability to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.
 
 
 45
 Id. at 211-12, 82 S.Ct. at 707 (footnotes omitted).
 
 
 46
 The Baker Court lent substance to this general call for careful analysis with the following description of factors that may show that a case involves a political question:
 
 
 47
 Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
 
 
 48
 Id. at 217, 82 S.Ct. at 710 (footnotes omitted).
 
 
 49
 We think it clear that none of the indicia specified by the Baker Court, nor the policy considerations that underlie the political question doctrine, support a finding of nonjusticiability here. Certainly there has been no constitutional commitment of this issue to a coordinate branch. Nor is the judiciary incapable of interpreting statutes. Our review of the Administrator's action no more involves a policy judgment or expresses a lack of respect due the executive than does any other question of statutory interpretation. The last two factors identified in Baker are the most nebulous. We think, however, that the circumstances of this case do not require "an unusual need for unquestioning adherence" to a possibly erroneous interpretation of the amendment. With regard to the last factor, the key consideration is that, at the end of the day, there will only be one pronouncement on this question. By reviewing the Administrator's determination, we simply assure that that final pronouncement, which is indisputably his to make, will be in accord with law and accepted principles of statutory construction.
 
 C.
 
 50
 Before reviewing the Administrator's determination, we have to consider two further preliminary questions. Both relate to the importance of the Administrator's November 25th statement. The Administrator made his statement after fiscal year 1985, the authority to obligate the $46 million earmarked for the UNFPA, and the amendment limiting the circumstances under which those funds might be obligated had all expired on September 30, 1985. Furthermore, the statement was made while litigation challenging the propriety of the Administrator's determination was pending in this court. Appellants contend that the statement should be disregarded for two reasons.
 
 
 51
 The appellants first assert that if the Administrator did not make a valid determination before the end of fiscal year 1985 that the earmarked funds must be withheld, he is required to disburse those funds in accord with the earmark. Because appellants claim the Administrator's September 25th decision is fatally flawed, they assert that we must order the Administrator to award them the funds. Second, appellants claim that, quite apart from the problems caused by the fiscal year's end, the November 25th statement is a post hoc rationalization and is entitled to no consideration. And, because the fiscal year has expired, appellants conclude that this court has no authority to remand to the Administrator for a fuller explanation of his actions or a redetermination. Again, therefore, appellants believe that the earmarked funds must be made available to them. Accordingly, our inquiry takes two parts. First, we examine the status of this appeal in light of the fact that fiscal year 1985 has ended. Second, we consider the effect of a statement made during the pendency of litigation.
 
 1.
 
 52
 In West Virginia Association of Community Health Centers v. Heckler, 734 F.2d 1570 (D.C.Cir.1984), we described the treatment of cases involving lapsed appropriations as follows:
 
 
 53
 It is an elementary principle of the federal budget process that, in general, a federal agency's budget authority lapses on the last day of the period for which funds were obligated. At that point, the unobligated funds revert back into the general Treasury....
 
 
 54
 Notwithstanding these basic principles of federal budgetary law, an equitable doctrine has been fashioned by the federal courts in recent years to permit funds to be awarded to a deserving plaintiff even after the statutory lapse date, as long as the lawsuit was instituted on or before that date.
 
 
 55
 Id. at 1576-77.
 
 
 56
 We think the principles relied upon in West Virginia Association are relevant to the circumstances of this case. If a government agency makes a procedurally proper determination to obligate funds before the expiration of a fiscal year and that determination is challenged and set aside (or, as here, the disbursement of the allocated funds enjoined) after the fiscal year's end, the same equitable doctrine that permits a court to award funds improperly withheld during a fiscal year permits a court to allow the government a second chance to obligate the funds. Thus, the Administrator's November 25th statement (his second attempt to allocate the funds in question here) will be given full consideration by this court. A determination like the Administrator's November 25th statement made after the close of a fiscal year can properly effect the allocation of funds left undisbursed during a fiscal year as a result of a pending lawsuit.
 
 
 57
 To require that the funds appropriated for population programs by the Act be awarded to the appellants simply because the Administrator was unable to properly make the determination required by the amendment before the end of the fiscal year would frustrate Congress' purpose in enacting the amendment. Congress' desire not to fund an organization that "supports or participates in the management of a program of coercive abortion or involuntary sterilization" would be thwarted if we refused to allow the Administrator to make a valid determination under the amendment. We must assume that Congress' desire to deny funds to organizations that fail the amendment's test was of equal dignity with its desire that organizations that passed that test receive the funds earmarked for them.
 
 2.
 
 58
 Assuming that any action or determination taken by the Administrator after the close of the fiscal year can affect the allocation of fiscal year 1985 appropriations, see supra, we must determine the effect of the Administrator's statement made while this litigation was pending. The Population Institute argues that the statement is a post hoc rationalization that cannot be used to support the Administrator's determination. If that contention were true, we would be required to review the Administrator's September 25th decision. And, as our Order of November 13th indicated, that determination would be unlikely to withstand such review.
 
 
 59
 Normally, an "administrative order cannot be upheld unless the grounds on which the agency acted in exercising its powers were those upon which its action can be sustained." Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). See also Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). This rule rests on several bases. The most important of these is the conviction that "[i]t is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress." Investment Company Institute v. Camp, 401 U.S. 617, 628, 91 S.Ct. 1091, 1098, 28 L.Ed.2d 367 (1970). Where Congress or the Executive vouchsafes part of its authority to an administrative agency, it is for the agency and the agency alone to exercise that authority. Judicial review of the propriety of administrative action properly encompasses not a determination of the outer limit of an administrator's raw power, but an examination of the reasoning and rationale actually offered for the particular action being reviewed. Thus, "post hoc rationalizations by counsel for agency action are entitled to little deference." Securities Industry Association v. Board of Governors of the Federal Reserve System, 468 U.S. 137, 143, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984).
 
 
 60
 We think it is clear from the applicable precedents that the Administrator's November 25th statement is not the sort of post hoc rationalization that may not be considered by a reviewing court. Here we are not confronted by a hypothetical explanation by appellate counsel of why an agency might have done something. Rather, the decisionmaker himself, faced with the knowledge gleaned from a formal opinion of this Court that his decision would likely not withstand appellate review, reconsidered the matter and arrived at the same result but expanded on his rationale. A court's normal refusal to consider counsel's post hoc rationalizations for administrative action is simply inapplicable. By reconsidering the matter before we could finally declare his first determination invalid the Administrator has essentially mooted our review of that first determination. It is appropriate and proper for us to review the determination that the Administrator made on November 25, 1985. Indeed, no purpose would be served by our reviewing the Administrator's September 25th rationale when we now know that he no longer relies on it to support his actions.
 
 
 61
 It will by no means always be appropriate for an agency to offer a new rationalization of administrative action during judicial review. This case uniquely presents a situation where an agency seeking to determine Congress' instructions could, after a preliminary court review, think things through again and offer a more acceptable explanation of its legislative interpretation. We hold only that in the circumstances of this case, it would be a senseless charade to review the Administrator's September 25th decision and not give credence to his subsequent pronouncement.D.
 
 
 62
 We turn to the ultimate question of whether the Administrator relied upon a valid interpretation of the amendment when he decided to withhold the $10 million from the UNFPA. We conclude that he did, and therefore affirm his decision.
 
 
 63
 In our Order granting the appellants an injunction pending appeal, we explained the flaws in the Administrator's approach to statutory interpretation and legislative history. There is no doubt that the Administrator's November 25th statement is far more sensitive and flexible than was his September 25th determination. Although the November statement is not a model of clarity, we find after careful examination that it validly interprets the amendment's meaning, and that the Administrator's determination to withhold the earmarked funds is therefore within the Congressional mandate.
 
 
 64
 In his November 25th statement the Administrator explained that the amendment calls for a two-part inquiry. First, it is necessary to determine if the Chinese population planning program includes coerced abortion. Second, it must be determined if the UNFPA
 
 
 65
 "supports or participates in the management of that program", i.e., the China "population planning program." Thus, if the China population program includes coerced abortion or involuntary sterilization and UNFPA supports or participates in the management of the China population planning program, assistance must be withheld from UNFPA even though it does not directly finance or support involuntary abortion or sterilization.
 
 
 66
 November 25th Statement at 7.
 
 
 67
 Thus, the Administrator concluded that when the amendment refers to "a program" it was referring to a country's entire population planning program. Any assistance to a country's tainted population planning program that rises to the level of management participation, regardless of its purpose or effect, will apparently trigger the amendment's prohibition. This part of the Administrator's explanation of the amendment's meaning draws no distinction between various sorts of management participation. The Administrator asserts that the amendment requires no nexus between management participation and the unacceptable aspects of the program in question in order to trigger the prohibition.
 
 
 68
 However, the Administrator's discussion of the UNFPA's activities in China casts doubt on whether the Administrator has in fact interpreted the amendment so stringently. In that portion of his November 25th statement describing the UNFPA's activities in China, the Administrator carefully explains how the demographic assistance and statistical expertise furnished to China by the UNFPA allows the Chinese to more effectively implement not their population planning program in general but their program of coercive abortion. See November 25th Statement at 10-12. The highly articulated nexus drawn by the Administrator between the UNFPA's activities and coercive abortions in China presents a sharply different view of the amendment than the earlier assertion that any management participation in a country that includes coerced abortions in its programs will trigger the amendment's prohibition.
 
 
 69
 Thus, despite some broad dicta in the Administrator's November 25th statement, the actual test applied in determining to withhold funds from UNFPA was narrow and tied specifically to a range of UNFPA activities in China that constituted far more than mere association with China's population planning program. We conclude that the specific factors relied on by the Administrator in determining that UNFPA should be denied funding for its activities in China in fact define his view of the amendment.
 
 
 70
 The narrow interpretation of the amendment that the Administrator has relied on in making the determination to withhold funds from the UNFPA in China is adequately supported by the language and legislative history of the amendment. The Administrator has arrived at a thoroughly reasonable view of the amendment's meaning. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In view of Congress' manifest desire to deny assistance to population planning programs that contain the prohibited elements, the Administrator's careful explanation of how the UNFPA's activities in China aid the aspects of China's program that Congress condemned amply supports his conclusion that funding UNFPA is prohibited by the amendment.
 
 
 71
 The Administrator's assertions (again in contrast to the standard actually applied in arriving at the decision) about what sort of assistance constitutes "participation in the management" of a program give us pause. In defining this term, the Administrator, as in his first determination, relied almost exclusively on the views of Representative Kemp. See November 25th Statement at 10 ("Although [Representative Kemp's] definition was not 'written in the statute,' it was the clearest explanation of an otherwise ambiguous term."). The problem with relying on this "clear explanation" of an "ambiguous term" is that Representative Kemp was unable to persuade his colleagues in the House Committee to adopt it. If the House Committee had desired clarity it could have included in its report the explanation that Representative Kemp was forced to put in his separate statement. That Representative Kemp's explanation was clear in fact cuts against employing it to define vague language in the statute--we know for certain that neither the House, nor the Senate, nor the conference committee saw fit to include this "clear explanation" in their reports or make it a part of the amendment itself. Thus, we can be fairly sure that a majority of Congressman Kemp's colleagues, however unsure they may have been as to what the amendment did mean, did not espouse his precise view of its meaning. In continuing to rely on Congressman Kemp's pronouncements, the Administrator may well have slighted our earlier admonition that "the key to legislative history is that while many elements represent pieces in the puzzle, no one piece--no matter how clear and unequivocal--is alone dispositive." See Order at 1080.
 
 
 72
 However, despite this error, the Administrator's explanation of the UNFPA's activities in China and their impact on the Chinese population planning program provide a sufficiently detailed explanation of why the amendment is offended in the circumstances here. See November 25th Statement at 10-12. We hold that although the Administrator has not been as careful or precise as he might have been in exploring the amendment's tangled legislative history, his decision was in fact reasonably grounded in a reasonable view of the amendment.
 
 III.
 
 73
 This case does not present a political question. Nor has the case been mooted by the passage of time. The case essentially presents a simple review of an administrative interpretation of an act of Congress. While the Administrator's statement could easily have been clearer and less ambiguous, it is also true that Congress could have provided him with clearer and less ambiguous instructions. The Administrator's decision passes muster. Accordingly, we reverse the decision of the district court and remand with instructions to affirm McPherson's decision to withhold the $10 million from UNFPA. Accordingly, we vacate the decision of the district court and remand with instructions to enter judgment for the appellees on the merits and affirm McPherson's decision to withhold funds from the UNFPA.
 
 
 74
 It is so ordered.
 
 APPENDIX
 
 75
 Before WALD and MIKVA, Circuit Judges, and McGOWAN, Senior Circuit Judge.
 
 ORDER
 
 76
 PER CURIAM.
 
 
 77
 Upon consideration of appellant's Motion for Injunction Pending Appeal, and the response and reply thereto, it is
 
 
 78
 ORDERED by the court, for the reasons stated more fully in the accompanying memorandum, that the motion is granted. It is
 
 
 79
 FURTHER ORDERED by the court, on its own motion, that the appeal is expedited. The following briefing schedule will be adopted:
 
 
 80
 Appellant's brief and
 joint appendix --December 2, 1985
Appellees' brief --December 16, 1985
Reply brief, if any --January 2, 1986
 
 
 81
 The Clerk is directed to schedule this case for oral argument during the January calendar.
 
 I. INTRODUCTION
 
 82
 This case arises from a decision by the Administrator of the Agency for International Development ("AID") to withhold $10 million from funds earmarked by Congress for the United Nations Fund for Population Activities ("UNFPA"). The Administrator's decision was made pursuant to a recently-enacted statute that prohibits funding for any organization which "supports or participates in the management of a program of coercive abortion or involuntary sterilization." Pub.L. No. 99-88, 1985 U.S. Code Cong. & Ad. News (99 Stat.) 293, 323 (1985). Although the government has subsequently reobligated the funds to other organizations, it has assured the court that those funds will not be disbursed before November 18, 1985. See Response to Appellants' Motion for Stay Pending Appeal at 3. Appellant, The Population Council, a UNFPA grantee, sought an injunction in the district court preventing the government from disbursing the funds to others and requiring the government to obligate the funds to UNFPA. The district court granted a motion by the government to dismiss the suit on October 18, 1985, on the grounds that the Administrator's decision was made pursuant to a lawful delegation of power, and that the complaint presented a nonjusticiable political question. Appellant has filed a notice of appeal, and seeks an injunction from this court preventing defendants from disbursing the funds to organizations other than UNFPA during the pendency of the appeal. For the reasons stated below, we grant appellant's motion for an injunction. Our decision is based primarily on our conclusion that there is a substantial probability that appellant will prevail in its appeal. At the same time we recognize that there are important underlying problems in the case that make prompt disposition essential. We therefore sua sponte expedite the appeal, which we will hear according to the expedited schedule attached.
 
 II. BACKGROUND
 
 83
 The defendants AID is an agency of the U.S. government which makes grants to governmental and international organizations from funds appropriated by Congress for population assistance. The defendant United States International Development Cooperation Agency ("IDCA") is AID's parent agency. See Reorganization Plan No. 2 of 1979, 44 Fed.Reg. 41,165 (1979) and Executive Order 12163, 44 Fed.Reg. 56,673 (1979). The defendant M. Peter McPherson is the Administrator of AID and the Acting Director of IDCA.
 
 
 84
 During FY 1985, Congress appropriated $290 million to be spent by AID for population assistance purposes. The Foreign Assistance and Related Programs Appropriations Act of 1984 stipulated that at least $46 million, or 16% of the total appropriations was to be channelled exclusively to UNFPA. Pub.L. No. 98-473, 98 Stat.1837, 1887 (1984) (hereinafter the "Act"). UNFPA, which is not a party to this action, receives approximately one-third of its total funding from AID. UNFPA in turn provides funds to foreign countries, including the People's Republic of China, and private grantees. Appellant Population Council is one such grantee. During FY 1985, UNFPA committed approximately $1.2 million to the Council.
 
 
 85
 The 1984 Act, however, also prohibited the funding of "any organization which includes as part of its population planning programs involuntary abortion." 98 Stat.1888 (1984). In 1985, the Act was amended further to provide that:"None of the funds made available in this bill nor any unobligated balances from prior appropriations may be made available to any organization or program which, as determined by the President of the United States, supports or participates in the management of a program of coercive abortion or involuntary sterilization."
 
 
 86
 Pub.L. No. 99-88, 1985 U.S. Code Cong. & Ad. News (99 Stat.) 293, 323 (1985) (emphasis added). The House Committee Report accompanying the amendment stated that the issue of whether an organization was involved in the prohibited activities "is of such significance that the determination should be made by the President" and indicated that "if this responsibility is delegated, ... [it would] be delegated only to the Secretary of State." H.R.Rep. No. 236, 99th Cong., 1st Sess. 53 (July 2, 1985).
 
 
 87
 The President is permitted to delegate any function vested in the President by law to the head of an executive branch agency or an official thereof "who is required to be appointed by and with the advice and consent of the Senate." 3 U.S.C. Sec. 301. On September 19, 1985, pursuant to section 301 and the Act,[1] the President delegated the power to determine whether an organization "supports or participates in the management of a program of coercive abortion or involuntary sterilization" to the Secretary of State. In this delegation, the President granted the Secretary "full authority to redelegate this function." On September 21, 1985, the Secretary of State redelegated the function to McPherson as the Acting Director of IDCA.
 
 
 88
 On September 25, 1985, the Administrator announced that $10 million of the amount earmarked for UNFPA would be withheld, and would be reprogrammed to other family planning programs before the close of FY 1985 on September 30. The Administrator took this action because he concluded that based on the criteria set out in Representative Kemp's "Additional Views" which accompanied the House Report on the bill, "at the current time, the UNFPA is participating in the management of a program of coercive abortion and involuntary sterilization in the People's Republic of China." The determination, made pursuant to the delegation of authority from the President and Secretary of State, was announced in a letter to Senator Mark Hatfield, written on IDCA stationary and signed by Mr. McPherson as Acting Director of IDCA. See Letter from M. Peter McPherson to Hon. Mark Hatfield, Chairman, Senate Committee on Appropriations (Sept. 25, 1985), reprinted in Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order, C.A. No. 85-3131, Ex. E.
 
 
 89
 Between September 25 and September 30, AID reprogrammed and re-obligated the $10 million withheld from UNFPA to other family planning programs, including several foreign governments. See Affidavit of Mr. James E. Painter, C.A. No. 85-3131, at 2-3. The government has represented to the court that no such funds will be disbursed before November 18, 1985. See Response to Appellants' Motion for Stay Pending Appeal at 3.
 
 
 90
 On September 30, 1985, three plaintiffs filed suit in the district court to enjoin the defendants from withholding the $10 million from UNFPA. The plaintiffs were The Population Institute, a grantee of UNFPA, and two United States Representatives. Appellant The Population Council moved to intervene on October 8, 1985. The plaintiffs sought to require the defendants to comply with the Act's stipulation that at least $46 million of AID funds be made available to UNFPA.[2]
 
 
 91
 Both The Population Institute and The Population Council alleged that they receive a significant portion of their funding from UNFPA, and that their family planning activities will be curtailed as a result of the defendants' actions.[3]
 
 
 92
 The complaint contained three counts: (1) the Administrator acted under an unlawful delegation of authority; (2) the Administrator's action was clearly erroneous, because it resulted from a misinterpretation of the Act; and (3) the Administrator's action was arbitrary and capricious, because there was no factual basis for finding that UNFPA was involved in a program of coercive abortion and involuntary sterilization in China. See Complaint for Declaratory and Injunctive Relief, C.A. No. 85-3131, at 18-25. On the same day the complaint was filed, the district court entered a temporary restraining order enjoining the government from disbursing the funds in question. Plaintiffs subsequently moved for a preliminary injunction, and the defendants moved to dismiss. In support of their motion, the defendants argued that the district court lacked jurisdiction over the controversy because: (1) the complaint presents a nonjusticiable political question; (2) AID's funding decision is committed to agency discretion and is unreviewable; (3) plaintiffs lack standing; and (4) the dispute is moot because the $10 million has already been re-obligated. See Points and Authorities in Support of Defendants' Motion to Dismiss, C.A. No. 85-3131, at 2-3.
 
 
 93
 On October 18, 1985, the district court issued its memorandum decision and order granting the motion to dismiss. First, relying in part on West Virginia Association of Community Health Centers, Inc. v. Heckler, 734 F.2d 1570 (D.C.Cir.1984), the court found that The Population Institute[4] had satisfied the standing requirements. In particular, the court found that the Institute had alleged both an anticipated injury and a causal connection between defendants' conduct and the injury, and that the Institute was within the zone of interests protected by the Act. See Memorandum Opinion, C.A. No. 85-3131 (Mem.Op.), at 10-13.
 
 
 94
 The court also concluded that the issue was not moot, because it could compel the agency to reallocate the funds. See id. at 13.
 
 
 95
 The court found the delegation issue more difficult. There was no question that the President's authority had been lawfully delegated to the Secretary of State. The plaintiffs contended, however, that the delegation to McPherson was unlawful because he had not been confirmed by the Senate as Acting Director of the IDCA. Plaintiffs relied upon Williams v. Phillips, 360 F.Supp. 1363 (D.D.C.1973), in which the district court held that an unconfirmed official named to a position requiring the advice and consent of Senate had no authority to exercise the powers of that office. Defendants countered that McPherson was also Director of AID, and had been confirmed by the Senate for that position. The court observed that, pursuant to a pre-existing delegation of authority, the function delegated to the Acting Director of IDCA would vest in McPherson in his capacity as Administrator of AID. See Mem.Op. at 14; 44 Fed.Reg. 57,521 (1979), as amended, 45 Fed.Reg. 74,090 (1980). The court distinguished Williams, where the official had not been confirmed in any position. See Mem.Op. at 15.
 
 
 96
 The court also rejected plaintiffs' assertions that the Act imposed an affirmative prohibition against delegation. In view of 3 U.S.C. Sec. 302, which provides that the President may delegate any function vested in the President by law "if such law does not affirmatively prohibit delegation," the precatory language in the committee report was not sufficient to invalidate the delegation to the Administrator.
 
 
 97
 The court declined to resolve the second and third counts of plaintiffs' complaint, finding that they presented nonjusticiable political questions. The court emphasized that Administrator McPherson had made the determination required by the Act, which has provided no standards to be applied in ascertaining whether UNFPA was engaging in the prohibited activities. Because of the diplomatic and foreign policy considerations, the court concluded that the executive's assessment of China's population program was entitled to "great deference." The court also expressed concern that the judiciary lacks the expertise to conduct the fact finding necessary to evaluate China's population program. Citing Crockett v. Reagan, 558 F.Supp. 893 (D.D.C.1982), aff'd, 720 F.2d 1355 (D.C.Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), in which the court held nonjusticiable a suit challenging U.S. military involvement in El Salvador, the district court concluded that the instant dispute presented a similar nonjusticiable question. See Mem.Op. at 19-20.
 
 
 98
 In its memorandum, the court conceded that "[t]he delegation issue is not free from doubt and has apparently not been directly addressed by our Court of Appeals." Id. at 20. The court accordingly entertained a motion for an injunction preventing the disbursement of funds during the appeal. After oral argument, the court denied the motion without prejudice on October 22. However, the court stated during the proceedings that its decision was based on
 
 
 99
 "faith in the unlikelihood that the government will move too swiftly, particularly in light of what I have said and in light of what the plaintiffs have said and in light of the embarrassment that you would suffer if the Court of Appeals thought you had quick-pitched them."
 
 
 100
 Motion for Injunction Pending Appeal, Record Excerpt C.
 
 
 101
 On October 18, 1985, The Population Council filed a notice of appeal from the district court's order of the same day. On October 25, appellant filed this motion for an injunction, pending appeal, restraining defendants from disbursing the $10 million in question to other organizations. The government filed a response in opposition to the motion for an injunction on October 28.
 
 III. ANALYSIS
 
 102
 The factors to be considered in determining whether injunctive relief pending appeal is warranted are: (1) the likelihood that the party seeking the injunction will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent an injunction; (3) the prospect that others will be harmed if the court issues the injunction; and (4) the public interest. Wisconsin Gas Co. v. Federal Energy Regulatory Commission, 758 F.2d 669, 673-74 (D.C.Cir.1985) (per curiam). The test is a flexible one. Injunctive relief may be granted with either a high likelihood of success and some injury, or vice versa. Cuomo v. United States Nuclear Regulatory Commission, 772 F.2d 972, 974 (D.C.Cir.1985).
 
 1. Likelihood of Success on the Merits
 
 103
 To obtain injunctive relief, appellant need not establish an absolute certainty of success: "[I]t will ordinarily be enough that the plaintiff has raised serious legal questions going to the merits, so serious, substantial, difficult as to make them a fair ground of litigation and thus for more deliberative investigation." Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C.Cir.1977).
 
 
 104
 Appellant indicates that there will be two primary issues on appeal: (1) whether the Administrator was acting under a lawful delegation of power; and (2) whether the Administrator's determination that UNFPA "participates in the management of a program of coercive abortion or involuntary sterilization" was correct as a matter of law. Memorandum in Support of Motion for Injunction Pending Appeal at 9. As will be discussed below, appellant has raised a serious legal question as to the second issue.
 
 
 105
 (a) Delegation
 
 
 106
 Appellant relies on Williams v. Phillips, 360 F.Supp. 1363 (D.D.C.1973), and contends that McPherson's lack of Senate confirmation as Acting Director of IDCA precludes him from exercising the authority delegated by the President and Secretary of State. However, McPherson has been confirmed as Administrator of AID. Moreover, pursuant to a pre-existing delegation of authority, the function delegated to McPherson as Acting Director of IDCA would automatically vest in him as Administrator of AID. See 44 Fed.Reg. 57,521 (1979), as amended, 45 Fed.Reg. 74,090 (1980). The Secretary of State relied upon this provision when he redelegated his authority to McPherson. See Affidavit of Patrick M. Norton, C.A. No. 85-3131. Although the legislative history reveals an expectation that only the President or Secretary of State would make the determination in question, the statute itself did not affirmatively prohibit delegation. Accordingly, delegation to the Administrator was not improper. See 3 U.S.C. Sec. 302 (1982). Because it appears that the district court decision on delegation was correct, appellant has failed to establish a likelihood of success on the first issue.
 
 
 107
 (b) Review of the Administration's Determination
 
 
 108
 The ground for the Administrator's determination that the statute bars funding for UNFPA because of its China programs is, however, exceedingly troublesome. The amendment prohibits AID from funding "any organization or program which ... supports or participates in the management of a program of coercive abortion or involuntary sterilization."
 
 
 109
 The language does not indicate the extent to which an organization must be involved with such program in order to be deemed a supporter or participant in the management thereof. Although the district court appeared to view this as a nonjusticiable political question, see Mem.Op. at 17-20, it is rather in our view purely an issue of statutory interpretation.
 
 
 110
 In applying the statutory standard to UNFPA's appropriation, the Administrator explained that:
 
 
 111
 In a study carried out earlier this year by the Agency for International Development (A.I.D.), it was concluded that the UNFPA does not include coercive abortion or involuntary sterilization in its own programs in China. I believe this to still be the case.
 
 
 112
 However, the Additional Views of Congressman Kemp (who was the author of the above mentioned amendment in the House), in the report accompanying the Supplemental Appropriations Act (House Report No. 99-142, page 232), states that assistance to an organization that engages in the following types of activities, in a country where there is coercive abortion or involuntary sterilization in the country's population program, was intended to be proscribed by the amendment: collection and analysis of demographic information necessary for such a program; training of the individuals who plan, manage and carry out such a program; and education and publicity about such programs.
 
 
 113
 * * *
 
 
 114
 * * *
 
 
 115
 Since the UNFPA provides assistance to the People's Republic of China in the general management areas described in Congressman Kemp's Additional Views to the Report accompanying the FY 1985 Supplemental Appropriations Act, and since we have concluded that sufficient evidence exists to indicate that implementation of the population program of the Government of the People's Republic of China results in such abuses, we have no alternative but to bar further obligation of funds in Fiscal Year 1985 to the UNFPA.
 
 
 116
 Letter from M. Peter McPherson to Hon. Mark Hatfield, Chairman, Senate Committee on Appropriations (Sept. 25, 1985), reprinted in Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order, C.A. No. 85-3131, Ex. E., at 2 (emphasis added). Administrator McPherson's decision to bar further funding of UNFPA was, therefore, premised on his conviction that the statute, as interpreted by Representative Kemp, left him no alternative.
 
 
 117
 The purpose and function of looking at the legislative history of a statute is to find out what Congress meant by its enactment. An individual legislator's expression of his understanding of a statute is only relevant inasmuch as it provides yet another piece in the puzzle of discerning legislative intent. The main pieces are, of course, the actual words that Congress chose to express its intention. While not as significant as the actual words, a committee's expression of its understanding also plays a relatively important role in piecing together the puzzle. Finally, critical legislators' statements are typically afforded an appropriate role in the process, as well. Thus, the key to legislative history is that while many elements represent pieces in the puzzle, no one piece--no matter how clear and unequivocal--is alone dispositive.
 
 
 118
 In this case, Administrator McPherson seems to have misunderstood his role in interpreting the amendment. His role was clearly and emphatically to arrive at an interpretation which, in his opinion, best represented Congress' understanding of the amendment. Yet, instead of trying to put the puzzle together by looking at all of the relevant factors, such as the language, relevant reports, statements of various senators, and statements of various congressmen, the Administrator appears to have considered himself absolutely bound by the statements of Representative Kemp, the author of the amendment in the House. Of course, the author's views are an important factor, see Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 394-95, 71 S.Ct. 745, 750-51, 95 L.Ed. 1035 (1951), and were it not as clear as it is that Administrator McPherson totally disregarded all other factors in reaching his conclusion that he was bound by Representative Kemp's statement, we would likely conclude that his decision was based on a reasoned evaluation of all of the appropriate factors, and we would defer to his interpretation. See Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (considerable deference afforded to agency interpretations). But, the Administrator actually treated the words of Representative Kemp's additional statement accompanying the Committee's report as if Congress had enacted them.
 
 
 119
 Indeed, examination of some of the other legislative history demonstrates that Representative Kemp's view of what the amendment meant was not shared by all of those who voted for it--or even those who sponsored it. Representative Kemp had predicted that UNFPA "would be immediately affected by this amendment because of its involvement with the program of coercive abortion in the People's Republic of China." H.R.Rep. No. 99-142, 99th Cong., 1st Sess. 232 (May 22, 1985) (additional views of Representative Kemp). Yet, Senator Inouye, who sponsored the amendment in the Senate, explicitly stated that "I believe that the full amount earmarked by Congress ought to be released to the UNFPA." 131 Cong.Rec. S8524 (daily ed. June 10, 1985). Similarly, even after adopting the amendment, Congress retained the stipulation that UNFPA receive $46 million of the funds appropriated to AID. These facts further evidence the Administrator's mistake in affording Representative Kemp's views the weight of law.
 
 
 120
 It is not for a court to determine whether, even if Administrator McPherson had properly evaluated all of the evidence bearing on Congress' intent, he would have reached the same conclusion. The opportunity to reach a reasoned interpretation of the statute belongs to the President and his delegates. We hold only that there is a reasonable likelihood that appellant will succeed in demonstrating that the President's delegate committed legal error when he mistakenly assumed that he was compelled by law to apply the statutory interpretation advanced by the author of the statutory language.
 
 
 121
 It is important to emphasize what we are not deciding. The issue of whether coerced abortions occur in China is not before this court, and, indeed, may well present a nonjusticiable question. Similarly, by finding that appellant has established a likelihood of success on the issue of agency statutory interpretation, we have neither considered nor decided whether UNFPA participates in coercive practices in China. We have merely indicated that appellant is likely to succeed in securing a remand to the agency for reconsideration of the decision that UNFPA's participation comes within the statutory ban.
 
 2. Irreparable injury to appellant
 
 122
 The ultimate relief sought by appellant is an injunction requiring the government to release the $10 million withheld from UNFPA's 1985 appropriation. Although the government has obligated these funds to other organizations, as yet no money has been disbursed. Accordingly, appellant has now sought an injunction preventing such disbursement while the appeal is pending. Appellant argues that it will be irreparably harmed without such an injunction because, if the government releases the funds to others, no funds will remain available for distribution to UNFPA if appellant prevails on the merits. For the reasons stated below, we agree that appellant will be irreparably harmed absent an injunction pending appeal.
 
 
 123
 In general, a federal agency's budget authority lapses on the last day of the period of which funds were obligated. See 31 U.S.C. Sec. 1502(a). After that date, any unobligated funds revert to the Treasury. See 31 U.S.C. Sec. 1552(a)(2). In this case, the government's authority to award funds appropriated for FY 1985 lapsed on September 30, 1985.
 
 
 124
 Nevertheless, it is well settled that federal courts may award appropriated funds to a successful litigant even after the statutory lapse date if, as here, the suit was initiated on or before that date. See e.g., Connecticut v. Schweiker, 684 F.2d 979, 996-99 (D.C.Cir.1982), cert. denied, 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983); 31 U.S.C. Sec. 1502(b). However, it is also true that application of this doctrine "assumes that funds remain after the statutory lapse date." West Virginia Association of Community Health Centers, Inc. v. Heckler, 734 F.2d 1570, 1577 (D.C.Cir.1984). In West Virginia Association, this court dismissed as moot a challenge to an agency's funding decision because all funds for the relevant fiscal year had been awarded and disbursed to other recipients. Id. at 1572. Similarly, in Ambach v. Bell, 686 F.2d 974, 986 (D.C.Cir.1982) (per curiam), we held that several states seeking to enjoin an agency from distributing funds to other states had established irreparable injury: "Once the ... funds are distributed to the States and obligated, they cannot be recouped. It will be impossible in the absence of a preliminary injunction to award the plaintiffs the relief they request if they should eventually prevail on the merits." (emphasis added).
 
 
 125
 Likewise, if the government in the instant case is permitted to distribute the $10 million to other organizations, the appeal will become moot. Appellant will suffer irreparable injury by the loss of UNFPA funding because this court will be unable to grant effective relief. Thus, appellant has satisfied this requirement for injunctive relief.
 
 3. Harm to others
 
 126
 The only other parties that would be affected by an injunction pending appeal are the organizations and countries to which the government committed the funds earmarked by Congress for UNFPA. The government argues that these organizations, and the needy people they serve, will be greatly harmed by any delay in the disbursement of funds promised by AID. See Response to Appellants' Motion for Stay Pending Appeal at 3. While we recognize that delay may cause some difficulties for those groups, we cannot agree that irreparable harm will result. As appellant correctly points out, the AID funds represent an unexpected windfall to those organizations. The funds were available for commitment only because they were withheld from UNFPA, and the other organizations are entitled to receive the funds only if the amount earmarked for UNFPA has been lawfully reduced. Any harm they suffer by delay in disbursement is outweighed by the clearly irreparable harm that appellant would sustain absent an injunction.
 
 4. The public interest
 
 127
 The public has an interest in assuring that public funds are appropriated and distributed pursuant to Congressional directives. As stated above, UNFPA is entitled to a specified percentage of the funds appropriated to AID unless the agency determines that UNFPA supports or participates in the management of a program of coercive abortion or sterilization. If AID is not enjoined from distributing the funds to others, and appellant prevails on appeal, the public interest will be frustrated by the failure to distribute the funds as dictated by Congress. By contrast, the public interest will be furthered by an injunction pending appeal, which will preserve UNFPA's ability to receive the funds if appellant is successful on appeal.
 
 IV. CONCLUSION
 
 128
 For the reasons stated above, appellant's motion for an injunction pending appeal is granted. Appellant has established a likelihood of success on the merits on one of the questions presented on appeal, and any harm to the other family planning organizations to which the funds were obligated is outweighed both by the irreparable harm to appellant and by the public interest in proper distribution of public funds. This court is aware of the sensitive nature and political implications of many of the issues presented, and recognizes that some of these issues may indeed turn out on further inquiry to be nonjusticiable political questions. However, the threshold question of whether the Administrator has properly resolved his statutory duty of deciding if UNFPA comes under the statutory ban is an issue of Congressional intent and clearly reviewable.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 The Foreign Assistance and Related Programs Appropriations Act of 1961 provides that the "President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct ..." 22 U.S.C. Sec. 2381(a)
 
 
 [2]
 The plaintiffs requested (1) injunctive relief requiring the defendants to obligate $10 million to UNFPA; (2) a declaratory judgment that the debarment of UNFPA was unlawful agency action and thus of no legal effect; and (3) payment of costs and fees. See Complaint for Declaratory and Injunctive Relief, C.A. No. 85-3131, at 25-26
 
 
 [3]
 The Population Institute, a nonprofit D.C. corporation, alleged that its pending request for funds from UNFPA had been denied. During FY 1985, the Institute had received $150,000, or 10% of its budget, from UNFPA. Affidavit of Werner H. Fornos, C.A. No. 85-3131, at 3. The Population Council, an international organization, alleged that, because of AID's failure to release the $10 million, it received only $700,000 of the approximately $1.2 million committed by UNFPA. Affidavit of George Zeidenstein, C.A. No. 85-3131, at 4-5. The Congressmen alleged no injuries in the complaint, and the district court expressed doubt about their standing to sue. See Memorandum Opinion, C.A. No. 85-3131, at 10
 
 
 [4]
 The court did not address the allegations of appellant The Population Council. According to the defendants, appellant was granted leave to intervene for purposes of taking this appeal. See Response to Appellants' Motion for Stay Pending Appeal at 5