# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 16, 2006         Decided April 21, 2006

No. 05-5049

OLIVIER BANCOULT, ET AL.,
APPELLANTS

v.

ROBERT S. MCNAMARA, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 01cv02629)

---

*Darrell Chichester*, student counsel, argued the cause for appellants. With him on the brief was *Michael E. Tigar*. *Aaron Lloyd*, *Ali A. Beydoun*, *Christine Parsadaian*, *Courtney J. Nogar*, *Debra L. Spinelli-Hays*, *Emily Creighton*, *James B. Cowden*, *Jennifer Dodenhoff*, *Karen Corrie*, *Laura Rotolo*, *Melissa Mandor*, and *Timothy L. Foden*, student counsel, entered appearances.

*Mark R. Freeman*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Daniel Meron*, Acting Assistant Attorney General, *Kenneth L. Wainstein,* U.S. Attorney, and *Mark B. Stern*, Attorney. *Dana J. Martin*, Attorney, entered an appearance.

2

Before: TATEL, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: In this case, we confront serious allegations involving events occurring forty years ago on the far side of the world. Appellants claim the United States government forcibly removed them from their homes on islands in the Indian Ocean in order to construct a military base. The district court dismissed all of Appellants' claims against the United States and the individual defendants. We affirm the district court's decision, finding that Appellants' claims present nonjusticiable political questions.

I

In his historic speech at Westminster College on March 5, 1946—the speech in which he first warned that an "iron curtain" had descended over Europe—Sir Winston Churchill described the "special relationship between the British Commonwealth and Empire and the United States." Blood, Toil, Tears and Sweat: The Speeches of Winston Churchill 301 (David Cannadine ed., 1989). Facing a looming Communist threat, Churchill argued that a key component of this special relationship needed to be military cooperation between the two nations, cooperation that included "joint use of . . . Naval and Air Force bases." *Id.* The dispute we address today arose from one of many instances in which Churchill's call to collaboration was heeded: the construction of the United States Navy Support Facility Diego Garcia in the British Indian Ocean Territory (BIOT).

The Chagos Archipelago, including the island of Diego Garcia, is located in BIOT; the British have controlled these islands since 1814. Appellants Olivier Bancoult, Jeanette

Therese Alexis, and Marie Isabelle France-Charlot claim to be indigenous people of Chagos and the direct descendants of indigenous Chagossians. Appellants Chagos Refugee Group and Chagos Social Committee are non-profit associations that work to further the welfare of the Chagossians. Appellants allege that, in 1964, the British and American governments began secretly negotiating the establishment of a U.S. military base in the Indian Ocean; following the "Anglo-American survey," the governments decided upon Diego Garcia as the location for this base. According to Appellants, the two countries decided to depopulate the entire archipelago, obscuring the true nature of their decision by portraying the islands' inhabitants as seasonal contract workers from Mauritius and Seychelles rather than permanent citizens of BIOT.

As described by Appellants, the depopulation of the islands occurred in three stages. First, beginning in 1965, Chagossians who traveled outside the archipelago were not allowed to return. Next, the United States allegedly placed an embargo on the islands to prevent the delivery of food supplies in order to starve the inhabitants out of the islands. According to Alexis, residents were threatened with death if they did not leave, and all the cats and dogs on Diego Garcia were slaughtered. In the third stage, Appellants claim, the remaining inhabitants of Diego Garcia were forced onto ships and sent to other islands in the archipelago; the entire population of the archipelago was removed two years later. Alexis claims the Chagossians were not fed during the six-day sea voyage in harsh conditions; she states that her mother was pregnant at the time of the journey but miscarried the day after arriving in Seychelles.

Appellants contend the Chagossians were stranded in Mauritius and Seychelles without housing, employment, or other assistance, and have been denied the right to return to Chagos ever since. Instead, Appellants state, they have been forced to

live in abject poverty in a foreign land, separated from their family graves and native community. Appellants claim that they have become ill by being exposed to diseases unknown in Chagos and by living in impoverished and squalid conditions. Bancoult states that his brother committed suicide due to the frustration of not being able to provide for his family in Mauritius. Appellants claim their real and personal property on Diego Garcia was destroyed during the construction of the military base. Finally, Appellants claim that the United States has discriminated against them in its hiring practices at the Diego Garcia base, hiring laborers from Mauritius, Seychelles, Sri Lanka, and the Philippines but refusing to hire any Chagossians (other than a few who concealed their ethnic heritage).

## II

Appellants filed suit against the United States on December 20, 2001, on behalf of themselves and all similarly situated Chagossians, seeking compensatory and punitive damages as well as declaratory and injunctive relief.[1] Several current and former senior officials in the Departments of Defense and State were also named as defendants under the Alien Tort Statute, 28 U.S.C. § 1350; the Chagossians claimed that these officials knew or should have known of the decisions regarding depopu-

---

[1] *See also R. v. Sec'y of State for Foreign & Commonwealth Affairs (Ex parte Bancoult)*, [2001] Q.B. 1067 (2000) (striking down British immigration ordinance preventing the Chagossians from returning to BIOT). In 2004, the Queen issued two Orders in Council overruling the High Court's decision and "restor[ing] full immigration control over all the islands" of BIOT. *See* Written Ministerial Statement of Parliamentary Under-Secretary of State for Foreign and Commonwealth Affairs, 422 Parl. Deb. (Hansard), H.C. (2004) 32-34WS, *available at* http://www.publications.parliament.uk/pa/cm200 304/cmhansrd/vo040615/wmstext/40615m03.htm.

lation and base construction and had direct authority over those who carried out the actions that harmed the islanders.[2] The Chagossians' claims included forced relocation; torture; racial discrimination; cruel, inhuman, or degrading treatment; genocide; intentional infliction of emotional distress; negligence; trespass; and destruction of real and personal property.

The United States and the individual defendants filed motions to dismiss, which the district court granted on December 21, 2004. *Bancoult v. McNamara*, 370 F. Supp. 2d 1 (2004). The court began by addressing the claims against the individual defendants, granting those defendants immunity under the Westfall Act, 28 U.S.C. § 2679. *Bancoult*, 370 F. Supp. 2d at 6-10. Under the Westfall Act, if the Attorney General certifies that an employee of the federal government was "acting within the scope of his office or employment" at the time of an incident, any claims arising out of that incident are converted into claims against the United States under the Federal Tort Claims Act (FTCA). *Id.* at 6 (quoting 28 U.S.C. § 2679(d)(1)). The Attorney General so certified, and the district court found that the Chagossians did not rebut the certification or show that an exception to Westfall immunity should apply. *Id.* at 10. Hence, the claims against the individual defendants were converted into FTCA claims against the United States. *Id.* The district court then dismissed these claims, finding that the Chagossians had failed to exhaust their administrative remedies, as required by 28 U.S.C. § 2675(a), and that the claims would be barred because the injuries were suffered on foreign soil, an exception established by 28 U.S.C. § 2680(k). *Id.* at 10-11 & n.8.

---

[2] Three other defendants—Halliburton Corporation, Brown & Root, Inc., and De Chazal Du Mee—were dismissed from the case and are not involved in this appeal.

Next, the district court turned to the political question doctrine, dismissing the remaining claims against the United States for lack of subject matter jurisdiction. *Id.* at 12-17. Applying the factors enumerated in *Baker v. Carr*, 369 U.S. 186, 217 (1962), the court found that (1) the "conduct of military operations and foreign policy complained of in this case" was the exclusive province of the political branches, *Bancoult*, 370 F. Supp. 2d at 15; (2) the court lacked adequate standards by which to judge the "foreign policy and national security concerns" involved in the case, *id.*; (3) the court could not appropriately "determine the national defense needs of the U.S. military in the Indian Ocean," *id.* at 16; (4) entertaining the Chagossians' claims would require the court to condemn the actions of Congress and the executive, showing a lack of respect for the political branches, *id.*; (5) unquestioning adherence to the political branches' decision to construct the military base was required, *id.* at 17; and (6) disturbing the government's "single voice" on this issue would subject all three branches to potential embarrassment, *id.*[3]

### III

We begin our discussion by clarifying the sequence in which we must address the issues raised. The "first and fundamental question" that we are "bound to ask and answer" is whether the court has jurisdiction to decide the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). "The requirement that jurisdiction be established as a threshold matter 'springs from the nature and limits of the judicial power of the United States' and is 'inflexible and

---

[3] The court also denied the Chagossians' request for a preliminary injunction, finding the request moot in light of the dismissal of all claims against the United States and the individual defendants. *Id.*

without exception.'" *Id.* at 94-95 (brackets omitted) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)). Therefore, a court must "address questions pertaining to its or a lower court's jurisdiction before proceeding to the merits." *Tenet v. Doe*, 125 S. Ct. 1230, 1235 n.4 (2005).

As we recently stated, "the courts lack jurisdiction over political decisions that are by their nature 'committed to the political branches to the exclusion of the judiciary.'" *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) (quoting *Antolok v. United States*, 873 F.2d 369, 379 (D.C. Cir. 1989) (opinion of Sentelle, J.)). The political question doctrine is one aspect of "the concept of justiciability, which expresses the jurisdictional limitations imposed on the federal courts by the 'case or controversy' requirement" of Article III of the Constitution. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974); *see also Hwang Geum Joo v. Japan*, 413 F.3d 45, 47-48 (D.C. Cir. 2005). As we find this issue to be dispositive, we do not reach any other jurisdictional issues, such as sovereign immunity, nor the merits of Appellants' claims.

IV

"The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker*, 369 U.S. at 210. The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). The framework laid out by the Supreme Court in *Baker* has become the authoritative taxonomy of the characteristics of political questions:

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217. "To find a political question, we need only conclude that one factor is present, not all," *Schneider*, 412 F.3d at 194, but "[u]nless one of these formulations is inextricable from the case at bar," we may not dismiss the claims as nonjusticiable under the political question doctrine, *Baker*, 369 U.S. at 217.

The instant case involves topics that serve as the quintessential sources of political questions: national security and foreign relations. "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). Foreign policy decisions

are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.

They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). "In framing policies relating to the great issues of national defense and security, the people are and must be, in a sense, at the mercy of their elected representatives." *Pauling v. McNamara*, 331 F.2d 796, 799 (D.C. Cir. 1963).[4] Thus, "[t]he fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive." *Luftig v. McNamara*, 373 F.2d 664, 665-66 (D.C. Cir. 1967) (per curiam).

We recently discussed the *Baker* framework at length in *Schneider*, which involved claims brought against the United States and former National Security Advisor Henry Kissinger for the alleged kidnapping, torture, and death of a Chilean general. 412 F.3d at 191. The plaintiffs in that case alleged that the United States had encouraged a military coup in Chile and that General Schneider was "neutralized" in order to allow the coup to succeed. *Id.* at 192. We found that "most" of the *Baker* factors were present in the case, indicating that the political question doctrine rendered the claims nonjusticiable. *Id.* at 194.

---

[4] *See also id.* (recognizing that judges cannot "regard [themselves] as some kind of Guardian Elders ordained to review the political judgments of elected representatives of the people").

Regarding the first *Baker* factor, we compiled an extensive list of constitutional provisions that entrusted foreign affairs and national security powers to the political branches:

Article I, Section 8 of the Constitution provides an enumeration of powers of the legislature. That article is richly laden with delegation of foreign policy and national security powers. Direct allocation of such power is found in Section 8, Clause 1, "the Congress shall have the Power To . . . provide for the Common Defence . . ."; Clause 3, "To regulate commerce with foreign nations"; Clause 10, "To define and punish Piracies and Felonies committed on the High Seas and Offenses against the Law of Nations"; Clause 11, "To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water"; Clause 12, "To raise and support Armies . . ."; Clause 13, "To provide and maintain a Navy"; Clause 14, "to make Rules for the Government and Regulation of the land and naval Forces"; Clause 15, "To provide for calling forth the Militia to . . . repel Invasions"; Clause 16, "To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States."

In addition to these direct allocations to the Congress of these foreign relations and national security powers, other sections and clauses of Article I bear on the subject . . . . For example, Section 9 of Article I provides for the suspension of the writ of habeas corpus "when in cases of . . . invasion the public safety may require it." Section 10 allocates to the Congress the authority to provide consent to individual states, without which they may not "enter into any Agreement or Compact with . . . a foreign Power, or engage in War . . . ." This is not to mention the perhaps less direct but undeniably real connection between national

security and other powers of Congress, such as that under Article I, Section 8, Clause 1, to "lay and collect Taxes," and Clause 2, to "borrow money on the credit of the United States."

Just as Article I of the Constitution evinces a clear textual allocation to the legislative branch, Article II likewise provides allocation of foreign relations and national security powers to the President, the unitary chief executive. Article II, Section 2 provides, *inter alia*, that "the President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States . . . ." That same section further provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, . . . [and to] appoint Ambassadors, other public Ministers and Consuls." Section 3 of Article II provides that "he shall receive Ambassadors and other public Ministers . . . and shall Commission all the Officers of the United States," including obviously the officers of the military.

*Id.* at 194-95. We noted that the only analogous provision regarding the judiciary is Article III, Section 1, which extends our jurisdiction to "Cases affecting Ambassadors, other public Ministers and Consuls." *Id.* at 195. After establishing this constitutional commitment of foreign policy to the political branches, we found that the plaintiffs' allegations fell squarely within this realm of exclusivity: "[A]t the height of the Cold War, officials of the executive branch . . . determined that it was in the best interest of the United States to take such steps as they deemed necessary" to combat the spread of communism in the Western Hemisphere. *Id.*

12

Regarding the second *Baker* factor, we found "a lack of judicially discoverable and manageable standards" for resolving the claims. *Id.* at 196. We could not "recast[] foreign policy and national security questions in tort terms," as that would require the court "to define the standard for the government's use of covert operations in conjunction with political turmoil in another country." *Id.* at 197. The third *Baker* factor implicated a similar yet antecedent problem: the court would be unable as an initial matter "[t]o determine *whether* drastic measures should be taken in matters of foreign policy and national security," *id.* (emphasis added), let alone define standards for evaluating those measures. Finally, we briefly noted the presence of the fourth *Baker* factor, finding that we would express a lack of respect to a coordinate branch of government if we passed judgment on the executive's decision to participate in the alleged covert operations. *Id.* at 198.

V

We recognize that "the contours of the [political question] doctrine are murky and unsettled." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (opinion of Bork, J.). Although the judiciary properly defers to the political branches in most such cases, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. Not every political case presents a political question. The *Baker* Court provided several examples of ways in which judicial action might "touch[]" foreign relations yet not encroach on the powers of the political branches, such as by construing treaties or prior executive statements in order to resolve disputes between private parties. *Id.* at 212-13. In *Population Institute v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986), and *DKT Memorial Fund, Ltd. v. Agency for International Development*, 810 F.2d 1236 (D.C. Cir. 1987), we noted that an indirect effect on foreign affairs would

not automatically render a case nonjusticiable. *Population Institute* involved a challenge to an administrative interpretation of an appropriations act that provided funding for international family planning organizations. 797 F.2d at 1066-67. We found the executive's interpretation of the act to be reviewable despite the possibility of a "vague impact" on foreign affairs; although foreign policy judgments were implicit in the process of disbursing the appropriated funds, the interpretation of the act itself was not a political question. *Id.* at 1070. Similarly, in *DKT Memorial*, we found that a challenge to an agency's implementation of a policy statement was justiciable, as the plaintiffs did "not seek to litigate the political and social wisdom" of the policy. 810 F.2d at 1238. Thus, in both of those cases, we undertook "a discriminating analysis of the particular question posed"; based on the specific facts and claims at issue, we found the cases to be justiciable, even though they "touche[d]" upon foreign relations issues. *Baker*, 369 U.S. at 211. In the same way, claims based on "the most fundamental liberty and property rights of this country's citizenry," such as the Takings and Due Process Clauses of the Fifth Amendment, are "justiciable, even if they implicate foreign policy decisions." *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 935 (D.C. Cir. 1988) (quoting *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1515 (D.C. Cir. 1984) (en banc), *vacated on other grounds*, 471 U.S. 1113 (1985), and citing *Regan v. Wald*, 468 U.S. 222 (1984) and *Dames & Moore v. Regan*, 453 U.S. 654 (1981)). Accordingly, "a challenge to the constitutionality of the manner in which an agency sought to implement an earlier policy pronouncement by the President" could be justiciable, even if other challenges to the policy or its implementation might be barred. *Schneider*, 412 F.3d at 198 (citing *DKT Mem'l*, 810 F.2d at 1238). Yet even though attenuated connections to foreign affairs do not prevent judicial review, and constitutional mandates may require it, generally "attacks on

foreign policymaking are nonjusticiable." *DKT Mem'l*, 810 F.2d at 1238 (citing *Population Inst.*, 797 F.2d at 1068-70).

VI

Appellants concede, and we agree, that the decision to establish a military base on Diego Garcia is not reviewable. Appellants' Br. at 15. That decision was an exercise of the foreign policy and national security powers entrusted by the Constitution to the political branches of our government, and we could not reexamine the choice without making a "policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Executive branch officials "determined that it was in the best interest of the United States," *Schneider*, 412 F.3d at 195, to gain a military presence in the Indian Ocean; they achieved this goal through negotiations with the British, a process into which the courts may not interject their judgment. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-20 (1936). As the district court stated, we have no "standards by which [we] can measure and balance the foreign policy considerations at play in this case, such as the containment of the Soviet Union in the Indian Ocean thirty years ago and . . . the support of military operations in the Middle East" today. *Bancoult*, 370 F. Supp. 2d at 15. If that decision is to be reconsidered, "the people are and must be, in a sense, at the mercy of their elected representatives." *Pauling*, 331 F.2d at 799.

However, Appellants contend that "[w]hile the Executive made a political decision to secure the Chagos Islands, the Chagossians were subjected to egregious and illegal conduct during the depopulation process." Appellants' Br. at 13. Appellants claim that the manner in which the policy decision was implemented is distinct from the policy itself, and is thus reviewable. *Id.* (citing *Schneider*, 412 F.3d at 197; *DKT Memorial*, 810 F.2d at 1237; *Population Institute*, 797 F.2d 1062; and

*Ramirez de Arellano*, 745 F.2d at 1515). Similarly, at oral argument, Appellants maintained that whereas the claims in *Schneider* may have been "inextricable from the broader policy" of encouraging a coup in Chile, the Chagossians' claims can be separated from the decision to establish the Diego Garcia base. Recording of Oral Arg. at 3:40-5:41.

We are unconvinced that the claims presented here merely "touch[]" on foreign policymaking. The specific tactical measures allegedly taken to depopulate the Chagos Archipelago and construct the Diego Garcia base are as inextricably intertwined with the underlying strategy of establishing a regional military presence as the alleged "neutralization" of General Schneider was with the policy of undermining Allende's government. *See Schneider*, 412 F.3d at 197. We are unconvinced by Appellants' efforts to distinguish this case from *Schneider*; the same logic that compelled our application of the political question doctrine in that case applies just as forcefully here.

In each case, the policy and its implementation constitute a sort of Möbius strip that we cannot sever without impermissibly impugning past policy and promising future remedies that will remain beyond our ken. Thus, just as we cannot review the decision to establish a base in the Indian Ocean (as Appellants concede), the same reasoning we applied in *Schneider* dictates that we cannot review the manner in which that decision was carried out. The political branches must "determine whether drastic measures should be taken in matters of foreign policy and national security," *id.*, and the President "must determine what degree of force [a] crisis demands," *The Prize Cases*, 67 U.S. (2 Black) 635, 670 (1863).[5] We cannot second-guess the

---

[5] *See also Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850) (stating that as Commander in Chief of the nation's military forces, the

degree to which the executive was willing to burden itself by protecting the Chagossians' well-being while pursuing the foreign policy goals of the United States; we may not dictate to the executive what its priorities should have been. In this respect, the specific steps taken to establish the base did not merely touch on foreign policy, but rather constituted foreign policy decisions themselves. If we were to hold that the executive owed a duty of care toward the Chagossians, or that the executive's actions in depopulating the islands and constructing the base had to comport with some minimum level of protections, we would be meddling in foreign affairs beyond our institutional competence. The courts may not bind the executive's hands on matters such as these, whether directly—by restricting what may be done—or indirectly—by restricting how the executive may do it. Finally, while the presence of constitutionally-protected liberties could require us to address limits on the foreign policy and national security powers assigned to the political branches, no such constitutional claims are at issue in this case. *Cf. People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999); *Harbury v. Deutch*, 233 F.3d 596, 603-04 (D.C. Cir. 2000), *rev'd in part, Christopher v. Harbury*, 536 U.S. 403 (2002).

## VII

The same considerations that render nonjusticiable the claims against the United States also bar the claims against the individual Appellees. Even were Appellants to demonstrate that the individual Appellees' actions were not in conformance with

---

President may "employ them in the manner he may deem most effectual"). While the current case does not involve battlefield decisions, the tactical and logistical details of establishing an overseas base are as much a matter of executive discretion as are strategic decisions.

presidential orders, the actions alleged were still closely enough connected to Appellees' employment to bring them within the ambit of the political question doctrine. *Cf. Schneider*, 412 F.3d at 199 ("Each of the claims for relief alleges acts by the Defendants which in the amended complaint consist only of the National Security Advisor and the United States. Their joint actions together can hardly be called anything other than foreign policy."). Although we need not resolve whether traditional agency principles guide the application of the political question doctrine, we have little trouble rejecting the claim that Appellees' acts fell outside the scope of their employment and therefore receive no shelter from the political question doctrine. The Restatement (Second) of Agency (1958) states:

> Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master, and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement § 228(1).[6] "To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." Restatement § 229(1).

---

[6] As we are not reaching the issue of Westfall certification, our discussion of the "scope of employment" is confined to the context of the political question doctrine; thus, we rely on general common law principles rather than the law of a specific state, as we would consult under Westfall. *Cf. Kimbro v. Velten*, 30 F.3d 1501, 1506 (D.C. Cir. 1994).

Assuming the allegations are correct, the individual Appellees were authorized to depopulate the Chagos Archipelago and establish a military base on Diego Garcia. All the acts alleged to have harmed the Chagossians directly furthered, or at least were incidental to, this authorized goal. The individual Appellees were all high-level executive officers who inherently possessed a large measure of discretion in carrying out the tasks assigned to them by the President. When authorized acts allegedly included removing an entire community from their home islands, transferring them elsewhere, and replacing their community with a military base, the use of harsh measures in the course of completing the tasks cannot be unexpected. Thus, the actions alleged to have caused harm to Appellants would not have been outside the scope of Appellees' employment.

For this reason, the claims against the individual Appellees are barred by the same separation of powers concerns that prevent the court from examining the claims against the United States. Examining these claims would require the court to judge the validity and wisdom of the executive's foreign policy decisions, as Appellees' acts were inextricably part of those policy decisions. This rationale does not entail some new form of immunity for executive officers who take actions in pursuit of foreign policy or national security goals; we merely hold that when the political question doctrine bars suit against the United States, this constitutional constraint cannot be circumvented merely by bringing claims against the individuals who committed the acts in question within the scope of their employment.

## VIII

Hence, we conclude that all the claims in this case present nonjusticiable political questions. The judgment of the district court is therefore

*Affirmed.*