Opinion for the Court filed by Circuit Judge GRIFFITH.
Opinion concurring in the judgment in part and dissenting in part filed by Circuit Judge GINSBURG.
*581 GRIFFITH, Circuit Judge:
In 1998, the President of the United States ordered a missile strike against a pharmaceutical plant in Sudan that he believed was connected to the terrorist activities of Osama bin Laden. The owners of the plant sued the United States, challenging several allegedly defamatory statements made by senior executive branch officials justifying the strike as well as the government’s failure to compensate them for the destruction of the plant. The district court dismissed plaintiffs’ complaint, and we affirm on the ground that it presents a nonjusticiable political question.
I.
Because we are asked to review the grant of a motion to dismiss, we treat the factual allegations in the complaint as true. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). In August 1998, the terrorist network led by Osama bin Laden bombed American embassies in Kenya and Tanzania. Days later, the United States responded with a missile strike against a pharmaceutical plant in North Khartoum, Sudan, owned by plaintiffs El-Shifa Pharmaceutical Industries Company (ElShifa) and Salah El Din Ahmed Mohammed Idris.
President Clinton justified the attack by publicly claiming that the El-Shifa plant was a “terrorists’ base of operation” and “associated with the bin Laden network.” Consistent with this claim, high-ranking executive branch officials also stated their belief that bin Laden financed the plant, which was owned by the Sudan Military Industrial Complex Corporation, made no commercial products, and, most ominously, was involved in the production of chemical weapons. To support this latter accusation, the officials pointed to a soil sample from the plant that included a chemical known as Oethylmethyl phosphonothioic acid, referred to as EMPTA, which is used in the manufacture of nerve gas.
Plaintiffs allege the Clinton Administration was wrong on all counts about its justifications for striking the plant. Neither bin Laden nor the Sudan Military Industrial Complex Corporation had ties to the plant, no chemical weapons agents such as EMPTA were ever present, and the plant produced only medicinal products, including over half the pharmaceuticals used in Sudan.
Once they learned that their initial justifications for the attack were false, Clinton Administration officials offered a new explanation that portrayed Idris, the actual owner of the plant, as a friend and supporter of terrorists. In particular, and as reported in several newspapers, anonymous executive branch officials claimed Idris was linked to bin Laden. The Washington Post, for example, reported “one official” as saying, “What we’re learning about [Idris] leads us to suspect that he’s involved in money laundering, that he’s involved in representing a lot of bin Laden’s interests in Sudan.” Vernon Loeb & Bradley Graham, Sudan Plant Was Probed Months Before Attack, Wash. Post, Sept. 1, 1998, at A14. According to plaintiffs, these statements were false.
Plaintiffs took several actions to recoup their losses from the attack. They first filed a lawsuit in the United States Court of Federal Claims seeking $50 million as just compensation under the Takings Clause of the Constitution. The court dismissed the suit as nonjusticiable under the political question doctrine and the United States Court of Appeals for the Federal Circuit affirmed. See El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1370 (Fed.Cir.2004). Plaintiffs also filed an administrative claim with the Central Intelligence Agency (CIA) under the Fed *582 eral Tort Claims Act (FTCA), seeking compensation for the destruction of the plant as well as a retraction of the allegedly defamatory statements about El-Shifa and Idris.
After the CIA denied the claim, plaintiffs filed this action against the United States under the FTCA seeking at least $50 million in damages for the government’s alleged negligence and trespass in carrying out the attack. At issue on appeal are two further claims. The plaintiffs also sought declaratory judgments that the statements linking them to “Osama bin Laden, international terrorist organizations and the production of chemical weapons” were false and that the government’s refusal to compensate them for the attack violated the law of nations. The district court granted the government’s motion to dismiss plaintiffs’ complaint for lack of subject matter jurisdiction, see Fed. R.Civ.P. 12(b)(1), concluding that sovereign immunity barred all of plaintiffs’ claims. El-Shifa Pharm. Indus. Co. v. United States, 402 F.Supp.2d 267, 270-73 (D.D.C.2005). The court also noted that the complaint “likely present[ed] a nonjusticiable political question.” Id. at 276. Plaintiffs fíled a motion to alter the judgment with respect to their claims for equitable relief, which the district court denied. El-Shifa Pharm. Indus. Co. v. United States, No. 01-731, 2007 WL 950082 (D.D.C. Mar. 28, 2007).
On appeal, plaintiffs challenge only the dismissal of their claims for equitable relief for defamation and under the law of nations. They restrict their defamation claim to statements about Idris and their law of nations claim to the refusal to pay compensation for the attack. We have jurisdiction under 28 U.S.C. § 1291 (2000), and we review the district court’s grant of the motion to dismiss de novo, see Carter v. Wash. Metro. Area Transit Auth., 503 F.3d 143, 145 (D.C.Cir.2007).
II.
The government urges us to affirm the district court’s dismissal of this case on the ground that it presents a nonjusticiable political question. Because we affirm on this basis, we do not address the government’s other arguments. See Nemariam v. Fed. Democratic Republic of Eth., 491 F.3d 470, 481 (D.C.Cir.2007).
Early in the nation’s history, Chief Justice John Marshall, in seminal words that shaped the development of the political question doctrine, explained that the limited authority the Constitution grants to the judiciary to resolve disputes does not extend to all complaints about the actions of the Executive:
The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in then-nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.
Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803). In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court explained that the political question doctrine precludes courts from considering cases that involve
a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political deci *583 sion already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Id. at 217, 82 S.Ct. 691. As Bakers first factor indicates, the doctrine is “primarily a function of the separation of powers,” id. at 210, 82 S.Ct. 691, and prohibits the judiciary from reviewing “policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch,” Japan Whaling Ass’n v. Am. Cetacean Soc’y, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (emphasis added).
Disputes involving national security and foreign policy decisions are “quintessential sources of political questions.” Bancoult v. McNamara, 445 F.3d 427, 433 (D.C.Cir.2006). The Constitution places these policy decisions in the hands of the President and Congress—not the judiciary. See Oetjen v. Cent. Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (“The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—‘the political’—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.”); Schneider v. Kissinger, 412 F.3d 190, 194 (D.C.Cir.2005) (“[Tjhere could ... be no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government.”); Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 933-34 (D.C.Cir.1988) (noting that “foreign policy decisions are the subject of ... a textual commitment”).
Even though “it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance,” Baker, 369 U.S. at 211, 82 S.Ct. 691, the political question doctrine looms over plaintiffs’ claims, this being a case that arises out of a decision to launch a military attack. We begin our analysis with a proposition upon which both parties agree: it is not for the federal courts to review the President’s battlefield decisions. Appellee’s Br. 18-21; Appellants’ Reply Br. 2; see Gilligan v. Morgan, 413 U.S. 1, 10-11, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); Bancoult, 445 F.3d at 436; Luftig v. McNamara, 373 F.2d 664, 665-66 (D.C.Cir.1967) (per curiam). President Clinton, in his capacity as Commander-in-Chief, fired missiles at a target of his choosing to pursue a military objective he had determined was in the national interest. Under the Constitution, this decision is immune from judicial review.
Although plaintiffs attempt to distance their law of nations and defamation claims from the nonjusticiable question of why the President ordered the missile strike, both claims nonetheless present questions “inextricably intertwined” with the underlying decision to attack the ElSh-ifa pharmaceutical plant. Plaintiffs’ law of nations claim asserts that under customary international law a state must compensate a foreign national for the unjustified destruction of property. Plaintiffs allege the United States violated this principle by failing to compensate them for the destruction of their plant. In passing judgment on this claim, the district court could not avoid becoming arbiter of the President’s battlefield actions and would need to determine whether his decision to bomb the plant was justified. See Appellants’ Reply Br. 4 (acknowledging this issue “could require the Court to consider whether El-Shifa was, in fact, a chemical weapons facility”).
This a court cannot do. We have consistently held that courts are not a forum for second-guessing the merits of foreign policy and national security decisions textually committed to the political *584 branches. See Gonzalez-Vera v. Kissinger, 449 F.3d 1260, 1263-64 (D.C.Cir.2006) (dismissing a suit concerning alleged unlawful U.S. assistance to the Pinochet regime because the challenged actions “were ‘inextricably intertwined with the underlying’ foreign policy decisions constitutionally committed to the political branches” (quoting Bancoult, 445 F.3d at 436)); see also Harbury v. Hayden, 522 F.3d 413, 420 (D.C.Cir.2008) (dismissing a suit against American officials alleged to have unlawfully conspired with the Guatemalan army because it sought a “determination[ ] whether the alleged conduct should have occurred, which impermissibly would require examining the wisdom of the underlying policies”); Bancoult, 445 F.3d at 436 (dismissing a suit challenging the tactical measures allegedly taken in depopulating island territories to build a naval base because the measures were “inextricably intertwined” with an exercise of “the foreign policy and national security powers entrusted ... to the political branches”); Schneider, 412 F.3d at 194-95 (dismissing a suit alleging that the United States assisted in the kidnapping, torture, and death of a Chilean general during the Cold War because it challenged a foreign policy decision textually committed to the political branches). This precedent controls our decision here. Plaintiffs’ law of nations claim asks us to review whether the President was justified in striking the ElShifa plant. Courts have no business hearing such claims.[1]
Plaintiffs’ defamation claim suffers from a similar flaw. The complaint plainly acknowledges that executive branch officials offered the allegedly defamatory statements in justification of the President’s decision to attack the plant. Compl. ¶ 1 (stating the action arises out of “false and defamatory statements made by United States government officials seeking to justify [the destruction of the El-Shifa pharmaceutical plant]”); id. ¶ 64 (concluding that U.S. officials offered these statements as “a new justification for their attack”). Consider the review the district court would need to undertake in ruling on this claim. To prevail in their defamation suit, the plaintiffs must show that the statements made to justify the attack were false. See generally Restatement (Second) of ToRts § 558 (1977). The district court, then, could not avoid the question whether Idris was in fact associated with bin Laden, meaning a judicial decision for the plaintiffs would directly contradict the Clinton Administration’s ultimate stated *585 justification for launching the missile strike.
The dissent notes that this allegedly defamatory justification came after the plant was bombed and thus argues that the plaintiffs’ claim would not call into question the President’s true motivations for launching the missile strike. See Dissenting Op. at 588-89. But both Idris and the dissent admit that the challenged statements were offered in justification of the decision to bomb the plant. See id. at 589 (citing Compl. ¶¶ 63-64). We have no trouble concluding that the President’s public justifications for discrete military action are always offered, in part at least, with strategic military, national security, or foreign policy objectives in mind. The making of such justifications is itself a policy decision that cannot be separated from the conduct of foreign relations and the exercise of the war power that it explains. See Appellee’s Br. 15 (“[PJublic statements about the bombing ... are closely intertwined with the decision to launch the military strike.”).[2] Accordingly, we conclude that a decision on the defamation claim would necessarily cross the barrier marked by the political question doctrine. See Schneider, 412 F.3d at 194 (“[TJhere could ... be no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government.”); cf. Wilson v. Libby, 535 F.3d 697, 704 (D.C.Cir.2008) (holding that the political question doctrine did not apply in a case involving “disclosures made by high-level executive branch officials when speaking with the press” because plaintiffs did not “challenge[ ] any foreign policy or national security decisions”).[3]
The dissent responds by arguing that judicial review of the allegedly defamatory statements about Idris is no more of an intrusion upon the Executive’s national security decisions than is judicial review of, for example, an enemy combatant determination, which the political question doctrine does not forbid. See Dissenting Op. at 590-91 (citing Boumediene v. Bush, — U.S. —, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008); Parhat v. Gates, 532 F.3d 834 (D.C.Cir.2008); Chai v. Dep’t of State, 466 F.3d 125 (D.C.Cir.2006); Von Zedtwitz v. Sutherland, 26 F.2d 525 (D.C.Cir.1928)). But none of the cases cited by the dissent involved a textual commitment of authority to the political branches. Boumediene found in the Suspension Clause a textual commitment to the judiciary of authority to review enemy combatant determinations resulting in prolonged detention. See 128 S.Ct. at 2247. Likewise, in Parhat,[4], Chai,[5] *586 and Von Zedtwitz,[6] we were not called upon to scrutinize decisions textually committed to a coordinate branch of government. In raising these cases, the dissent presents an interesting question concerning the boundary between decisions properly made by the judiciary and decisions constitutionally committed to the political branches. Fortunately, we need not decide where that boundary lies. Plaintiffs’ defamation claim presents a challenge to the Executive’s foreign policy and national security decisionmaking, two areas clearly outside our authority.
III.
We conclude that this case presents a nonjusticiable political question. The judgment of the district court dismissing plaintiffs’ claims is

Affirmed.

. We disagree with our dissenting colleague’s conclusion that the law of nations claim has been forfeited. See Dissenting Op. at 587. Plaintiffs fully brief the claim challenging the CIA's failure to compensate, which the district court also addressed, and so it must be addressed here. The dissent assumes that the law of nations claim replicates the abandoned claim that the attack was unjustified. That reasoning mistakenly conflates the concepts of claims and issues. The claim in the challenge to the attack was that plaintiffs were entitled to a declaratory judgment that the President was wrong to order the strike (Claim 1). That claim has been forfeited. The law of nations claim is that plaintiffs are entitled to a declaratory judgment that the CIA wrongfully refused to compensate plaintiffs (Claim 2). An issue in Claim 2 is whether the President unjustifiably ordered the strike, for if the attack was justified no compensation was due. The question presented in Claim 1 is also an issue in Claim 2. The dissent wrongly concludes that because Claim 1 is forfeited and because it raises an issue in Claim 2, Claim 2 is also forfeited. Claim 1 challenged an action by the President, whose sovereign immunity is not waived by the Administrative Procedure Act (APA). By contrast, Claim 2 challenges the action of a federal agency whose sovereign immunity is waived by the APA, 5 U.S.C. § 702 (2006). Crucially, the relief requested in Claim 1 ran against the President, while in Claim 2 it runs against the CIA. Although judicial review of Claim 2 may require review of an issue presented in Claim 1, Claim 2 is not barred by sovereign immunity and is properly before us.

. According to the dissent, Idris can avoid dismissal here by stating that the President's justifications for the missile strike were made not in furtherance of national security or foreign policy, but merely to avoid public embarrassment. See Dissenting Op. at 589-90. Implicit in the dissent’s argument on this point is a suggestion, which we reject, that plaintiffs can avoid the political question bar at the motion to dismiss stage by artful pleading that recasts the terms of a dispute to make it one properly reviewed by courts.

. The dissent assumes that we find decision-making in these fields exclusively within the President's Commander-in-Chief authority. See Dissenting Op. at 590-91. We express no such opinion. Rather, we simply rest our holding on the proposition that the conduct of our foreign relations is committed to the political departments, "and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision,” Oetjen, 246 U.S. at 302, 38 S.Ct. 309.

. Parhat, 532 F.3d at 839 (citing the Detainee Treatment Act, section 1005(e)(2)(A) of which gives this court "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant”).

. Chai, 466 F.3d at 128-29 (citing 8 U.S.C. § 1189(c) (2006), which allows an entity des *586 ignated as a terrorist organization under the Antiterrorism and Effective Death Penalty Act to seek judicial review in this court).

. Von Zedtwitz, 26 F.2d at 526-27 (citing the Trading with the Enemy Act, section 9(a) of which provides for judicial review of certain seizures of property).